# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7754 | **DATE** | 7/2/2004 |
| **CASE TITLE** | Thomas vs. Sternes | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court denies the petition for a writ of habeas corpus. The Clerk of Court is directed to enter judgment in favor of Respondent.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| OR | courtroom deputy's initials | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK

2004 JUL -4 AM 11: 26

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANDRE THOMAS, )
                    Petitioner, )
            )
            )
vs. )      Case No. 03 C 7754
            )
            )
JERRY L. STERNES, Warden, )
Dixon Correctional Center, )
            )
           Respondent. )

DOCKETED

JUL 6 - 2004

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

    Andre Thomas and two co-defendants were indicted on October 4, 1995 for the first

degree murder of fellow gang member Clifford Ray. The State alleged that Thomas, a governor

of the Gangster Disciples, fatally shot Ray at Thomas' home during a gang meeting, after Ray

fired a gun when co-defendants Ronnie Sloan and Anthony Adams began beating him for

refusing to pay "political dues" to the gang and "disrespecting" Thomas. Thomas and his co-

defendants were convicted after a bench trial in 1997, and Thomas was sentenced to thirty years

in prison. Thomas maintains that he is not guilty of first-degree murder because he acted in self

defense or with an unreasonable apprehension of imminent death, rendering his conduct second-

degree not first-degree murder.

    Thomas seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He raises four

claims in his *pro se* petition. In his first claim, he argues he was denied a fair trial, due process and equal protection because prosecutors negated his self-defense claim by arguing he was accountable for his co-defendants' actions and, therefore, the initial aggressor. He insists that as the shooter, he could not be convicted under the accountability theory because it does not apply to principals. In his second claim, Thomas argues he was denied a fair trial, due process and equal protection because the trial judge did not appropriately consider all the evidence and failed to require the State to prove he acted "without lawful justification." In essence, he challenges the sufficiency of the evidence that he was accountable for the initial violence against Ray. Thomas further claims the trial judge ignored evidence that the victim shot two individuals in Thomas' home – evidence he says was essential to his claim that he acted in self defense or with an unreasonable belief of imminent danger. In his third claim, Thomas argues his attorneys were ineffective in violation of the Sixth Amendment in that they failed to present any evidence of self-defense, failed to interview eyewitness Dave Sloan, and refused Thomas' repeated requests to testify at trial. Thomas' final claim is that he was denied a full and fair hearing of his post-conviction claims in violation of the due process and equal protection clauses. This final claim is not an appropriate ground for issuing the writ, so it will not be considered.

## Background

### *The trial*

Judge Themis Karnezis presided over Thomas, Adams and Sloan's trial in August 1997. The cases were severed, but the judge heard evidence against all three defendants simultaneously. Thomas was represented by Charles Ingles and Richard Beuke. The prosecution's key witnesses were Lashon Coleman and Karrience Golden, who testified they were present at Thomas'

apartment on South Marshfield in Chicago when the fatal shooting occurred. At the time Golden testified, he had a criminal charge pending and had been convicted of felonies in 1992 and 1994. Trial Tr. (Aug. 8, 1997) at E4-E5. When Coleman testified, he was serving a 120-month sentence for a federal felony conviction and had three state felony convictions from 1991, 1993 and 1994. Trial Tr. (Aug. 7, 1997) at D31, D80.

Coleman testified that at the time of the shooting, Thomas was a governor of the Gangster Disciples, and Adams served as his assistant.[1] *Id.* at D36. Coleman testified that governors collected political fees from gang members and that a member would be "violated" if he did not pay his dues or if he was disrespectful to a governor. *Id.* at D47-D49. He explained that violations ranged from a monetary fine to death, with intermediate penalties, including a "pumpkin head," which is when a person is beaten about the face. *Id.* at D48-D49. Coleman said that on September 26, 1995, Thomas told him to come over to his house to take care of "nation" business, which Coleman understood could involve a violation. *Id.* at D125. Although Coleman conceded on cross-examination that the nation business could have been about concert tickets, *id.*, he said, unsolicited, that he was known for giving violations and "[he] knew what it was when [he] came through there." *Id.* at D126.

According to Coleman, approximately eight men gathered in Thomas' living room, and Thomas accused Ray of not paying political dues. *Id.* at D50. Ray responded that a group had decided not to pay political dues because they needed the money for their children. *Id.* Adams asked Ray if he heard "folks" talking to him and punched him on the right side of his face. *Id.* at

---

[1] According to Coleman, the hierarchical positions of the gang, in descending order, were chairman of the board, board members, governors, regents, coordinators and rank-and-file members. Trial Tr. (Aug. 7, 1997) at D32-D33.

D51-53. Ronnie Sloan then said "I got something for you" and hit Ray in the midsection with a baseball bat. *Id.* at D53-57. Coleman testified that Thomas had not told Sloan to hit Ray with a baseball bat, but when asked on cross-examination whether Thomas had told anyone to hit Ray, Coleman responded: "He didn't have to. He's a governor." *Id.* at D127.

Coleman testified that Ray had not threatened anyone before Adams and Sloan assaulted him. *Id.* at D55-57. But after Sloan hit Ray with the bat, someone in the house yelled that Ray had a gun, and Coleman heard two or three shots. *Id.* at D57-D58. Coleman ran to the back of the house and saw Thomas standing in the dining room near Ray. *Id.* at D58-D59. Coleman tried to go out the back of the apartment, but when he could not, he ran back to the front of the house. *Id.* at D59. He heard about two or three more shots and hid in a closet. *Id.* at D60.

Coleman testified that after the shooting stopped, he ran to the front room and saw that a man in a wheelchair, identified as James Howe,[2] had been shot. *Id.* at D61. Howe asked Coleman to take him to the hospital, so Coleman carried him outside and put him in Thomas' car. *Id.* Ray was laying outside the house near a gun. *Id.* at D61-D62. After placing Howe in Thomas' car, Coleman put Ray in Thomas' car. *Id.* at D62. Thomas told Coleman not to put Ray on his seat, so Coleman put Ray on the car floor. *Id.* at D62-63. Coleman found Ray and Thomas' guns in the alley behind Thomas' house and sold one of them. *Id.* at D63-D64. Later that day, Thomas and Adams came to Coleman's house and asked him about the gun. *Id.* at D65. Coleman told them his sister had it, and they told him they would be back for it. *Id.* at D65-D64. Coleman went to his mother's home and then went to the police station. *Id.* at D67.

---

[2] In the trial transcript, this individual is referred to as James Howe, James Howie, James Huey and James Howard. The Court will refer to him as James Howe.

When cross-examined by Beuke, Coleman admitted that when he testified before the grand jury, he used a false name: Terrence Brown. *Id.* at D90-91. Ronnie Sloan's attorney Herbert Goldberg elicited from Coleman that he had used the false names Deshawn Coleman and Deshawn Atkins in the past. *Id.* at D118. He also admitted that he was on probation at the time the shooting occurred and lied to the police and state's attorneys on September 28, 1995 when he told them he had been out of the gang for five years. *Id.* at D118, D122. In response to questioning by Beuke, he explained that he had lied because there was a warrant for his arrest. *Id.* at D94. Coleman denied serving as a police informant in 1995, *id.* at D82, but a detective later testified that Coleman had been an informant. *Id.* at DD48.

Coleman said he did not remember telling the police that he saw the victim holding the gun and firing wildly. *Id.* at D100. But Beuke read into the record the part of Coleman's grand jury testimony in which he said he saw Ray holding the gun and shooting. *Id.* at D103. Later on redirect, Coleman said that Adams and Ronnie Sloan were wrestling with Ray when Coleman heard the first gunshots. *Id.* at D141.

On cross-examination by Beuke, Coleman said that he remembered telling the grand jury that as he ran to the back of the house, he saw Thomas run toward the front room with a gun. *Id.* at 104. Coleman also said he had told the police that he saw Thomas trying to get the back door of the house open and although Coleman did not know whether Thomas could get the door open, Coleman could not. *Id.* at D108. Coleman said Thomas broke out a window and jumped. *Id.*

The State's other key eyewitness was Karrience Golden, Ray's best friend. Trial Tr. (Aug. 8, 1997) at E6. Golden testified that at the time of the shooting, he had been a Gangster Disciple for nine years, and James Howe, who was wheel-chair bound, was his regent. *Id.* at E6-

E7. Golden said he and Ray were on the South Side around noon on September 26, 1995, when Howe approached in a car with his girlfriend. *Id.* at E10. Golden went with Howe to drop off Howe's girlfriend, and then they picked up Ray. *Id.* at E11. Howe told Golden to drive them to Thomas' home but did not tell them why. *Id.*

According to Golden, the three men entered Thomas' house, and Ray sat on a low stool. *Id.* at E14-E15. Thomas asked Howe why he wasn't paying political dues; Howe responded that "he couldn't get up with the guys to get no money." *Id.* at E16-E17. Thomas then asked Golden if he had paid his dues; Golden said no. *Id.* at E17-E18.

Ronnie Sloan and his twin brothers Dave and David then entered Thomas' house, Golden testified. *Id.* at E18. Thomas continued to talk about political dues for about thirty to forty minutes. *Id.* at E20. Thomas stood while he talked; Adams sat on the couch behind Thomas; Ronnie Sloan stood in the doorway to the dining room. *Id.* at E20-E21. Thomas asked Ray why he was not paying political dues, and Ray responded that he did not have any money and had a child. *Id.* at E21. Thomas sighed and went to the back of the house. *Id.* at E24. Adams stood up and said that's a governor you're talking to. *Id.* at E25. Thomas walked back into the living room holding a .380 caliber gun behind his thigh. *Id.* at E25-E26. Adams walked toward Ray and punched him on the left side of the face when Ray stood up. *Id.* at E26, E28.

Golden knew Ray had a 9 millimeter gun in the front of his pants under his shirt, but the gun was not visible. *Id.* at E27. Ray tried to grab his gun, but Ronnie Sloan hit him on his side with a bat. *Id.* at E28-E29. Ray got trapped in the doorway and grabbed his gun. *Id.* at E29-E30. Someone in the room yelled out that he had a gun. *Id.* at E30. Adams struggled with Ray for the gun, trying to prevent Ray from shooting, so Ray was not able to point it. *Id.* at E31-E32.

6

Golden heard two gun shots, and one of the bullets hit him in the right knee and exited his knee and hit Howe in the chest. *Id.* at E32-E35. Golden dove over the couch and heard two or three more shots about 15 seconds after the first series of shots. *Id.* at E35.

When the shooting stopped, Golden could not stand, but he saw Howe carried out of the house. *Id.* at E36. After the house emptied, Thomas ran back into the front room from the dining room. *Id.* Golden stood up and looked at Thomas and Thomas ran back out. *Id.* Unable to walk, Golden pushed himself toward the door on his back and pushed the door open, and someone carried him out to the police in front of Thomas' house. *Id.* at E36-E37. An ambulance transported Golden to the hospital. *Id.* at E38. A few days later, Adams came to Golden's house and asked him what he had told the police and whether he was sticking to the story that a drive-by shooting had occurred. *Id.* at E40-E41. Golden told Adams that he had not told police there was a drive-by shooting but rather had told them three people had come into the house and there had been a struggle. *Id.* at E41. Golden testified that he did not identify the three men to the police because he was afraid of Thomas' status as a governor. *Id.* at E41-42.

Beuke's cross-examination of Golden revealed that Ray sometimes carried a gun and had gone to get his gun before Golden and Howe drove him to Thomas' home. *Id.* at E48-E50. Ray showed Golden and Howe the gun before Ray got into the car. *Id.* at E62. Golden said the bullet that hit him came from Ray's gun, *id.* at E60, and he admitted that after he dove over the couch, he did not see who fired the other shots. *Id.* at E63. Golden said he had never met Thomas, Adams or Ronnie Sloan before September 26, 1995. *Id.* at E51-E52. He did not remember someone named Terrence Brown or Lashon Coleman being at Thomas' house, nor did he recognize Coleman in court as someone who had been in Thomas' house when the shooting

7

occurred. *Id.* at E53-54. Golden said he had gotten out of jail only a couple of months before the shooting, *id.* at E55-E56, and that he, Howe and Ray were smoking marijuana on the way to Thomas' house. *Id.* at E62-63.

After receiving treatment at Holy Cross Hospital, Golden told a detective who came by to question him that he and Howe had gone to Thomas' house to watch television and that fifteen minutes after they arrived, they heard something. *Id.* at E71-E72. He said one of the men in the apartment went to the door and began struggling with the offender. *Id.* Someone in the apartment said "he's got a gun" and then he heard shots. *Id.* at E72-E73. Golden said the men gathered in Thomas' apartment did not fire any of the shots, rather they all tried to get away. *Id.* at E73. He claimed that he threw his leg up to block his face and after he was shot, he dove over the couch. *Id.* An assistant state's attorney came to Golden's house a year later, told him they were prosecuting Thomas, Adams and Sloan, and wanted to know the whole story. *Id.* at E77-78. Golden said he lied in his earlier statement to police because Adams had told him to go along with the drive-by shooting story. *Id.* at E79-E80.

The parties stipulated that the bullet removed from Ray was fired from a .380 caliber gun. *Id.* at E131. The doctor who performed an autopsy on Ray testified that there was no evidence that Ray's fatal gunshot wound to the left chest was self-inflicted. *Id.* E124, E127-28. She also testified that Ray had cuts on the left side of his face consistent with having been punched. *Id.* at E124, E131. She said Ray did not have bruising on his mid-section or arms but said that if someone died soon after being hit, bruises might not develop on his body but may develop on his face because the face bruises more easily. *Id.* at E132-33.

One of the police officers who arrived at the scene shortly after the shooting testified that

he found shell casings for a .380 caliber weapon on the floor by the foyer door, in the living room and in the dining room. Trial Tr. (Aug. 7, 1997) at D147-49. Detective Thomas Coughlin testified that as Thomas was being treated for a cut on his chin and scrapes on his elbow at St. Bernard's Hospital the day of the shooting, Thomas told him that he had been seated on his front porch with Adams, Ronnie Sloan, David Sloan and a woman when three black men pulled up in front of his house in a red, four-door Chevy. *Id.* at DD13-DD14, DD18. Coughlin said Thomas claimed one of the men got out of the car holding a pistol. *Id.* at DD14-15. Thomas said he heard two or three shots as he ran through his apartment to the back porch, where he broke a window with his elbow and crawled out. *Id.* at DD15. Thomas saw the red Chevy drive northbound on Marshfield, and he went inside his home and saw Howe sitting on the living room floor. *Id.* at DD16. Howe said he had been shot, so Thomas helped him into his car and drove him to the hospital. *Id.* While driving back to his house to find Ronnie Sloan, Thomas noticed Ray laying in the back seat of his car. *Id.* Thomas slapped Ray, and when he was unresponsive, Thomas drove back to the hospital. *Id.* at DD17.

Detective Joseph Fine testified that when he interviewed Thomas at the police station on September 28, 1995, he told Thomas what Coleman and Ronnie Sloan's brother David had told police. Thomas responded that what they said was true, "that he tried not to push Clifford Ray into pulling a gun," that he knew Ray had a gun and "he tried everything he could to not ... hurt that boy." *Id.* at DD35, DD38. When he was cross-examined by Adams' attorney Frank Edwards, the detective testified that Coleman had told him that he had been summoned to Thomas' house for nation business and was hoping it concerned the sale of concert tickets. *Id.* at DD61. The detective also testified that Coleman told him that after Ray was hit with the bat, Ray

pulled out a gun and began shooting. *Id.* at DD62-DD63.

At the close of the prosecution's case, all three defendants' attorneys moved for a directed finding of not guilty. Beuke argued that the State's case was based on the incredible testimony of convicted felons who gave multiple stories to the police and, in Coleman's case, the grand jury. He emphasized the inconsistencies between Coleman and Golden's accounts and Coleman's lie to the court that he was not an informant. Beuke tried to discredit the testimony that Thomas had confessed, pointing out that all statements in the case but that one were written down and that when an assistant state's attorney spoke with Thomas, he denied making a statement. *Id.* (Aug. 8, 1997) at E189. Beuke and Edwards argued that no one had testified that Thomas told Adams or Sloan to beat Ray, *id.* at E179, E196, and Goldberg said the State had failed to present evidence that the fatal shots came from Thomas' gun. *Id.* at E190. In response, the State listed the many points on which Coleman and Golden agreed, arguing the inconsistencies amounted only to collateral impeachment. *Id.* at E199-E202. Judge Karnezis denied the motion without further explanation. *Id.* at E207.

The defense case consisted of one witness and several stipulations. Officer Anna Fox testified that Golden gave several versions of events when she spoke with him after the shooting in front of Thomas' house. *Id.* at E212. The parties made several stipulations. The parties stipulated that an assistant state's attorney and Detective Fine would testify that on September 28, 1995, they interviewed Terrence Brown, who said he had been out of the Gangster Disciples for five years and that Ronnie Sloan hit Ray with a baseball bat. *Id.* at E226-27. The parties agreed that a court reporter present when Brown was questioned would testify that Brown had said Ray started shooting and that he saw the gun in Ray's hand. *Id.* at E227-28. The parties

10

also stipulated that Detective Fine would testify that Brown had said Ray started shooting wildly and everyone started running, that Brown had picked up Ray's gun and put it in his waistband, and that he would have taken the other gun if he could have grabbed it without being seen by rival gang members. *Id.* at E230. The parties also agreed that a police officer would testify that on April 10, 1995, he arrested Ray for aggravated discharge and possession of a firearm, Trial Tr. (Aug. 12, 1997) at G8-G9, and that another police officer would testify that he arrested Ray on April 26, 1995 for possession of a firearm and on July 4, 1995, for aggravated assault and possession of a firearm and that charges from both offenses were pending at the time Ray died. *Id.* at G9-G10.

Judge Karnezis admonished each defendant of his right to testify and to remain silent and asked each if he wanted to waive his right to testify. Each defendant said he wished to do so. *Id.* at G11.

Beuke's closing argument was much like his argument for a directed finding. He argued Coleman and Golden were not credible and gave contradictory accounts of the events. He pointed out that neither Coleman nor Golden saw who fired the bullet that killed Ray. *Id.* at G20, G22. Goldberg set forth in his closing argument what the prosecution had to prove and argued it had failed to meet its burden. Edwards argued that the prosecution had failed to present evidence of a common scheme or plan to kill Ray. *Id.* at G39.

The prosecution's closing argument is worthy of mention because it included the legal theories that Thomas has challenged at various times on direct appeal and collateral review. The prosecutor argued that all three defendants were legally accountable for Ray's murder because when people conspire to commit a battery, each person is responsible for the conduct of the

others in furtherance of the battery. *Id.* at G58. He said: "the common criminal design of these three defendants was to violate Clifford Ray for not paying the dues and for disrespecting the governor. And they each acted in furtherance of that common goal." *Id.* He argued that shooting Ray was not justified even if Ray had fired his gun, because "after Andre goes and gets the gun, not only do they disarm the victim, not only are they able to restrain the victim to the extent where he ends up shooting his own best friend and the guy he drove with, they have him teed up like a golf ball so Andre can come back and shoot him right smack dab in the middle of the chest." *Id.* at G58-G59.

The prosecutor stated that under 720 ILCS 5/7-1, "a person is justified in the use of force against another when and to [the] extent he reasonably believes such conduct is necessary to defend himself or another against such others' imminent use of -- in the case of a murder, great bodily harm or deadly force." *Id.* at G59. And under 720 ILCS 5/7-4, "if a person initially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon his assailant, he can't claim self-defense unless such force is so great he reasonably believes that he's in imminent danger of death or great bodily harm and he has exhausted every reasonable means to escape such danger." *Id.* at G61. The prosecutor said Ray did not pose an imminent threat and Thomas did not try to escape. *Id.* at G61-62. He concluded by saying that Ray, as a victim of a forcible felony, had a right to defend himself. *Id.* at G63.

Following the closing arguments, Judge Karnezis rendered his decision. He explained:

> There were a couple of things there is no question about in this case.
> There is absolutely no question that Clifford Ray is dead. There is absolutely no
> question that Clifford Ray died as the result of a gunshot wound to the chest.
> There is absolutely no question in this case that on that date, . . . September 26,
> 1995 on the south side of Chicago, Clifford Ray went to that location on South

12

Marshfield with a gun.

There are questions about other things. There are questions as to whether these individuals, Mr. Thomas, Mr. Sloan and Mr. Adams, are accountable for any conduct which occurred therein. Accountability, a person is legally responsible for the conduct of another person when either before or during the commission of an offense and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of an offense.

*Id.* at G64-G65. Saying, "[i]n for a penny, in for a pound," the judge found each defendant guilty of first degree murder. *Id.* at G65.

### Direct appeal

Thomas filed a direct appeal, arguing: (1) he was entitled to raise a claim of self defense because the prosecution failed to prove he was accountable for the actions of his co-defendants and, therefore, the initial aggressor; (2) he was denied a fair trial because the State tried to convict him on the basis of his role in the Gangster Disciples; (3) he was not proven guilty beyond a reasonable doubt because Coleman and Golden could have been prosecuted for Ray's death and their testimony was inconsistent and substantially impeached; and (4) he should not have been tried with his co-defendants because the evidence against them tainted the fairness of his trial. Resp. Ex. A. The appellate court affirmed his conviction, *People v. Thomas*, 307 Ill. App. 3d 1076, 760 N.E.2d 1063 (1999) (table). Petitioner sought review of the decision by the Illinois Supreme Court. In his petition for leave to appeal, he argued that he should not have been convicted under the theory of accountability because the prosecution failed to rebut his claim of self defense and the Judge failed to consider his reasonable or unreasonable belief that his actions were justified. Resp. Ex. E. The court denied his petition. *People v. Thomas*, 187 Ill. 2d 589, 724 N.E.2d 1274 (2000) (table).

### *State post-conviction petition*

Thomas then filed a *pro se* post-conviction petition, in which he argued that he was denied due process of law in that (1) he was prosecuted under the accountability theory even though he was a principal, depriving him of his claim of self defense; (2) the trial court relieved the prosecution's burden of proving Thomas had acted without lawful justification; and (3) the trial court prevented Thomas from cross-examining Golden as to his motive for testifying falsely against him. Resp. Ex. G ¶¶ 6-9. Thomas also claimed he was deprived of effective assistance of counsel in violation of the Sixth Amendment because his attorneys advised him against testifying on his own behalf, stipulated that the victim was fatally shot with a .380 caliber weapon and failed to (1) conduct an independent investigation and interview all witnesses relevant to Thomas' self-defense claim; (2) research the legal defenses to first-degree murder; (3) subpoena Dave Sloan to testify; (4) present any evidence that Thomas acted in self defense or defense of his home; (5) argue Thomas' reaction to the victim's conduct constituted at most second-degree murder; (6) ask the trial court to sever Thomas' trial from that of his co-defendants; and (7) file a motion to suppress ballistics evidence. *Id.* ¶¶ 10-11. In denying Thomas' petition on August 18, 2000, Judge James Linn addressed only the ineffective assistance of counsel claim, stating:

> Andre Thomas has brought a Post-Conviction Petition. The Court did have a chance to review this.
> He is complaining now that he took his lawyer's advice by not testifying, and although he told him he wanted to testify, he didn't testify because he took his lawyers advice.
> He had two lawyers: Chuck Engles [sic] and Richard Beuke. Both of them are superb, seasoned lawyers. Everything I read in the Petition appears that it was a very good judgment call on their behalf not to call him as a witness, albeit he was convicted and sentenced to a lengthy penitentiary sentence.

I do not find that anything in the Petition indicates attorney misconduct or something that would come close to the *Strickland* Standard for the relief he is some [sic] requesting.

Accordingly, his Pro Se Petition for Post-Conviction Relief is denied.

Resp. Ex. I at 6.

With representation from the Public Defender of Cook County, Thomas appealed, arguing the lower court had failed to consider whether Thomas had raised a meritorious Sixth Amendment claim that he was denied effective assistance of counsel because his attorneys failed to call Sloan to testify and refused Thomas' requests to testify on his own behalf. *Id.* at 7-13. In an unpublished order, the appellate court affirmed the denial of Thomas' post-conviction petition. *People v. Thomas,* No. 1-00-3519 (Ill. App. Nov. 27, 2002). Thomas filed a petition for rehearing, which was denied on January 31, 2003. Resp. Ex. N. Thomas again sought leave to appeal to the Illinois Supreme Court, arguing first, that the appellate court did not apply the appropriate standard for determining whether Thomas had raised the "gist" of a constitutional claim in alleging his attorneys refused to let him testify and failed to call Dave Sloan to testify, and second, that the trial judge erred in basing his holding on his knowledge of the attorneys' skills rather than considering Thomas' claims of specific incidences of ineffective assistance. Resp. Ex. O. The court denied leave to appeal. *People v. Thomas*, 204 Ill. 2d 680, 792 N.E.2d 312 (2003) (table).

Thomas filed his *pro se* habeas corpus petition with this Court on October 31, 2003.

### Exhaustion & Procedural Default

The Court cannot reach the merits of Thomas' claims if he failed to "provide[] the state courts with a full and fair opportunity to review" them. *Moore v. Parke*, 148 F.3d 705, 708 (7th

Cir. 1998) (citing *Picard v. Connor*, 404 U.S. 270, 276 (1971), and *Boerckel v. O'Sullivan*, 135 F.3d 1194, 1196 (7th Cir. 1998)). To provide the state courts with a "full and fair opportunity" to review his claims, the petitioner must "have exhausted his state remedies and have avoided procedurally defaulting his claims during the state court proceedings." *Id.* (citing 28 U.S.C. § 2254(b), (c) and *United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1132 (7th Cir. 1990)). Respondent admits that Thomas has exhausted the claims raised in his habeas petition, *see* Answer at 9, thus exhaustion is not at issue in this case. However, Respondent argues that Thomas has procedurally defaulted his first and second claims and part of his third claim. *Id.*

As we have noted elsewhere, "[p]rocedural default occurs when the petitioner fails to present a claim to the state courts at the time, and in the way, required by the state, or when a state court has declined to address a federal claim because the petitioner failed to satisfy an independent and adequate state procedural requirement." *U.S. ex rel. Bradford v. Gilmore*, 98 C 1593, 2000 WL 549489, at *3 (N.D. Ill. May 1, 2000) (citations omitted). In Illinois, an issue that could have been raised on direct appeal but was not is forfeited, as are those claims the petitioner could not have raised on direct appeal but failed to raise in a state post-conviction petition. *Id.* (citations omitted). When presenting a claim to the state court, the petitioner "must present his claims in such a way as to 'fairly alert the state court to any applicable [federal] constitutional grounds for the claim.'" *Bocian v. Godinez*, 101 F.3d 465, 469 (7th Cir. 1996) (quoting *Green v. Peters*, 36 F.3d 602, 605 (7th Cir. 1994)). The Seventh Circuit has explained that to do so, the petitioner must submit "both the operative facts and the controlling legal principles of a constitutional claim" to the state court. *Id.* (citing *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)). And the petitioner "must give the state courts one full opportunity to

16

resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Respondent argues Thomas failed to do so.

Thomas' first claim is that a principal cannot be convicted under the accountability theory. He first made this argument in his *pro se* petition for relief under the Illinois Post Conviction Hearing Act. *See* Resp. Ex. G ¶ 7. However, he did not raise this claim when he appealed the denial of his post-conviction petition, *see* Resp. Ex. I, or in his PLA filed with the Illinois Supreme Court. *See* Resp. Ex. O. Therefore, he failed to pursue the claim through a full round of post-conviction review.

Petitioner did raise a related claim on direct appeal of his conviction. He claimed he was entitled to argue he acted in self defense because the prosecution had failed to prove he was accountable for the actions of his co-defendants. Resp. Ex. A. He then sought leave to appeal to the Illinois Supreme Court, arguing the appellate court erred in finding he was not entitled to raise a claim of self defense on the ground that a rational trier of fact could have found he was accountable for his co-defendants' actions and was, therefore, an initial aggressor. Resp. Ex. E.

Thomas' argument on direct appeal that his accountability for the acts of Adams and Sloan had not been proven did not preserve the claim he raises here. To be sure, the argument was based on the same facts as his argument that a principal cannot be convicted under the accountability theory. But the Seventh Circuit recently reminded us that "the fact that two different claims arise from a common set of facts is not enough to avoid default." *Sweeney v. Carter*, 361 F.3d 327, 333 (7th Cir. 2004) (citations omitted). Though "'a mere variation in legal theory' does not automatically lead to a finding of failure to exhaust," and "a petitioner may

reformulate her claims so long as the substance of the claim remains the same," *id.* (citations omitted), such is not the case here. The substance of the claim Thomas pursued on direct appeal is distinct from the one he makes today. On direct appeal, Thomas challenged the sufficiency of the evidence showing him accountable for his co-defendants' conduct, *see* Resp. Ex. A at 14-19; in his federal habeas petition, Thomas challenges the propriety of using the accountability theory to convict a principal. These claims are logically distinct, and Thomas' briefs on direct appeal did not raise the legal arguments offered today. Therefore, Thomas has defaulted his first claim.

Construed liberally, Thomas' second claim challenges the sufficiency of the evidence – particularly, the evidence that he was accountable for the actions of his co-defendants. Thomas challenged the sufficiency of the evidence on direct appeal, Resp. Ex. A at 14-19, and in his petition for leave to appeal to the Illinois Supreme Court. Resp. Ex. E. Because Thomas pursued his sufficiency claim through an entire round of direct review, he preserved the claim. Accordingly, we must consider his challenge to the sufficiency of the evidence on the merits. However, the Court will not consider Thomas' assertion that Judge Karnezis failed to take certain evidence into consideration because there is no indication in the record that Judge Karnezis failed to consider the evidence presented to him.[3]

We also must consider Thomas' ineffective assistance of counsel claim on the merits. Respondent admits Thomas has not procedurally defaulted his claim that he was denied effective assistance of counsel because his attorneys failed to interview and call Dave Sloan as a witness, and refused Thomas' requests to testify on his own behalf. Answer at 12. Respondent does

---

[3] The fact that Judge Karnezis did not *mention* certain evidence in his brief oral ruling does not mean he failed to *consider* that evidence.

argue that Thomas defaulted his claim that he was denied effective assistance of counsel because his trial attorneys failed to present evidence in support of his claim of self defense. But Thomas responds by explaining that he only has two grounds for claiming ineffective assistance of counsel and that his allegation that his attorneys failed to put on any evidence of self-defense is not an independent ground for relief but rather is subsumed by his claims that they failed to call him and Dave Sloan to testify. Pet.'s Resp. at 16. Because Thomas does not argue that his attorneys' failure to put on evidence of self-defense is a separate ground for a finding of ineffective assistance, we need not consider whether that argument was defaulted as Respondent claims.

Thus Thomas has defaulted only one of the claims raised in his federal habeas petition: that a principal cannot be convicted under the accountability theory. Usually, we would consider whether Thomas falls within an exception that would allow the Court to consider his defaulted claim, that is whether Thomas has demonstrated "either 'cause' and actual 'prejudice'" for defaulting the claim or that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted). However, we need not do so here because even if Thomas had not defaulted his first claim for relief, we would not be able to review it because it is based entirely on state law.

Although Thomas generally alleges in his first claim for relief that he was "denied a fair trial, due process and equal protection" – all guarantees of the United States Constitution – his argument relies almost exclusively on state cases that do not engage in federal constitutional analysis. Thomas cites a few federal cases either for their statement of Illinois law or the proposition that evidence of gang membership should be excluded. *See* Pet.'s Resp. at 2-5. But

19

his argument that a principal cannot be convicted under the accountability theory is premised entirely on state law. The Court can "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody *in violation of the Constitution or laws or treaties of the United States*." 28 U.S.C. § 2254(a) (emphasis added). Therefore, even if Thomas had not defaulted his legal challenge to the application of the accountability theory to principals or had an excuse for his default, the Court could not consider his claim because it does not raise an issue of federal constitutional law.

## Review on the Merits

The Court cannot grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; . . . " 28 U.S.C. § 2254(d)(1). The Supreme Court has explained that "the phrases 'contrary to' and 'unreasonable application of' have independent meaning." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362, 404 (2000)).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court," if the state court's decision is "'substantially different from relevant [Supreme Court] precedent.'" *Id.* (quoting *Williams*, 529 U.S. at 405). More precisely, a state court's decision falls within the "contrary to" clause if "the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result." *Id.* "However, if the state court applied the proper rule, yet reached a

conclusion that the federal habeas court would not have independently reached, the federal court *cannot* grant the writ based on the 'contrary to' clause." *Id.* (emphasis in original; citing *Williams*, 529 U.S. at 406).

The Supreme Court has explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Williams*, 529 U.S. at 412 (emphasis in original); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) ("The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous."). That is, "[u]nder § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. "Rather, the application must be objectively unreasonable" for the federal habeas court to issue the writ. *Andrade,* 538 U.S. at 76 (citing *Williams*, 529 U.S. at 409). We review the Illinois appellate court's decisions with these principles in mind.

1.    *Sufficiency of the evidence*

When a federal court reviews a claim that the State's evidence was insufficient to prove the petitioner's guilt beyond a reasonable doubt, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original; citation omitted). But the Court is not reviewing Thomas' sufficiency claim in the first instance. Rather, the Court must ask whether the Illinois appellate court's denial of Thomas' sufficiency claim was "contrary to" or an "unreasonable application of" federal law.

The state court set forth the proper standard for reviewing Thomas' insufficiency claim. The Court then outlined the elements essential to proving a defendant guilty under the accountability theory.

> In order to convict a defendant under the theory of accountability, the prosecution must prove beyond a reasonable doubt that: "(1) the defendant solicited, aided, abetted, agreed or attempted to aid another person in the commission of the offense; (2) the participation took place either before or during the commission of the offense; and (3) the defendant had a concurrent, specific intent to promote or facilitate the commission of the offense." *[People v.] Jones*, 302 Ill. App. 3d [892,] 901 [(1998)]; *People v. Martin*, 271 Ill. App. 3d 346, 351, 648 N.E.2d 992 (1995); 720 ILCS 5/5-2(c) (West 1994). Events surrounding and following the commission of a crime are sufficient evidence to establish participation in the crime for the purposes of accountability. *Jones*, 302 Ill. App. 3d at 901; *Martin*, 271 Ill. App. 3d at 352.

*People v. Thomas*, No. 1-97-4302, slip op. at 15-16 (Ill. App. Aug. 27, 1999). The appellate court concluded that when the evidence was viewed in the light most favorable to the prosecution, it supported Thomas' conviction under the accountability theory. The Court explained:

> The testimony of Coleman and Golden established that the course of events culminating in the victim's beating and shooting began when members of the Gangster Disciples gathered at defendant's home, pursuant to his request to take care of some nation business. Such a meeting could have involved the imposition of penalties for violations. Coleman and Golden testified that defendant, as governor, one of the gang's higher ranking positions, was responsible for ensuring that the laws and policies of the gang were honored. Failing to pay political fees, disrespecting a governor, and breaking any laws of policy were reasons why a member of the gang may be violated.

At the meeting, the victim revealed that he would not be paying his political fees. In doing so, the victim committed two violations; he failed to fulfill his obligation to pay said fees and, in the process, disrespected defendant, a governor. Therefore, the conditions were ripe for violations to be imposed on the victim. At that point, Sloan and Adams attacked the victim, and defendant retrieved a .380 semiautomatic handgun, which was the same caliber as the bullet found in the victim during the autopsy. At no time did defendant order codefendants, his subordinates, to stop their attack on the victim. It can be inferred from the circumstances that defendant shared a common plan with codefendants to mete out punishment to the victim because of his violations of gang laws and policies. In addition to his presence at the scene of the crime, defendant did not report the crime to the police and continued to associate with the perpetrators following the incident. Indeed, defendant and Adams approached Coleman to try to recover the gun used in the shooting. Furthermore, Adams asked Golden what story he told the police and if he was sticking to his story. Importantly, there is nothing in the record indicating that anyone present during the shooting was responsible, other than defendant and his codefendants.

*Id.* at 17-19. The appellate court reasoned that because "a rational trier of fact could find the essential elements of the offense of first-degree murder beyond a reasonable doubt under the accountability theory," Thomas "was not entitled to raise self-defense as an affirmative defense." *Id.* at 19. Accordingly, the court did not consider whether the State had failed to rebut Thomas' claim of self-defense beyond a reasonable doubt.

The Court cannot say the appellate court's decision was contrary to or an unreasonable application of federal constitutional law. The evidence, viewed in the light most favorable to the prosecution, showed that Thomas, a governor of the Gangster Disciples, convened a meeting at his home to discuss "nation" business. Nation business includes beating – and in some circumstances, killing – gang members who have violated the rules of the gang. Ray was brought to the meeting by a regent of the gang, and Thomas immediately questioned Ray about his failure to pay dues. Ray said he would not pay his dues. In response, Thomas retrieved a gun, Adams punched Ray in the face, and Sloan hit him with a baseball bat. A rational trier of

23

fact could conclude from these facts that Thomas was accountable for Adams and Sloan's conduct. And even though neither Coleman or Golden testified that they saw Thomas shoot Ray, the circumstantial evidence supported the conclusion that he was the shooter.

In Illinois, self defense is not available to a defendant who:

(a) Is attempting to commit, committing, or escaping after the commission of, a forcible felony; or
(b) Initially provokes the use of force against himself, with the intent to use such force as an excuse to inflict bodily harm upon the assailant; or
(c) Otherwise initially provokes the use of force against himself, unless:
(1) Such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or
(2) In good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force.

720 ILCS 5/7-4. Viewed in the light most favorable to the prosecution, the evidence showed that Adams and Sloan struggled with Ray for control of the gun. The fact that Ray shot his friends Golden and Howe suggested that Adams and Sloan had prevented Ray from aiming the gun and would subdue him – if they had not already done so. The evidence also showed that Thomas shot Ray even though Thomas could have fled as he eventually did after shooting Ray. Under these circumstances, a rational trier of fact could find beyond a reasonable doubt that Thomas could not have reasonably believed he was in imminent danger and did not exhaust every reasonable means to escape the danger, including withdrawing from the scene or subduing Ray without the use of force that was likely to cause death or great bodily harm. Furthermore, a rational trier of fact could find beyond a reasonable doubt that Thomas gave Ray no indication that he would walk away from the show of violence. Therefore, the Court cannot conclude that

24

the state appellate court's decision rejecting Thomas' sufficiency claim was contrary to or an unreasonable application of federal law.

## 2. Ineffective assistance of counsel

The Court also must consider whether the appellate court's decision rejecting Thomas' ineffective assistance of counsel claim was contrary to or an unreasonable application of federal law. The Illinois appellate court properly cited *Strickland v. Washington*, 466 U.S. 668 (1984), as the Supreme Court precedent applicable to Thomas' ineffective assistance of counsel claim. Under *Strickland*, a petitioner can only prevail on his claim of ineffective assistance of counsel if he can show that his "counsel's performance was deficient" and "the deficient performance prejudiced the defendant," meaning "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To satisfy the first component of this standard, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This is a "highly deferential" standard. *Id.* at 689. Thus the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Because the Illinois appellate court correctly identified the governing Supreme Court principle, the Court may only grant the writ if we find the state court "unreasonably applie[d] that principle to the facts of [Thomas'] case." *Williams*, 529 U.S. at 413.

Thomas made the same arguments before the Illinois appellate court as he does here: that he was denied effective assistance of counsel because his attorneys failed to call Dave Sloan to

testify and discouraged Thomas from testifying on his own behalf. In support of his claims, Thomas provided the appellate court with his own affidavit and affidavits from Dave Sloan, Patricia Lowe, Stanley Thomas and Bonia Smith.

Sloan's affidavit states that he and his brothers, David and defendant Ronnie, went to Thomas' house on September 26, 1995 to see if Thomas had hung flyers they had given him advertising a party they were hosting. Sloan Aff. at 1. As they drove up, he saw Coleman enter Thomas' house. *Id.* When the Sloans arrived, Thomas was with Adams, Coleman, Howe, Golden and Ray. *Id.* Howe told Thomas that he was having a hard time collecting political dues, and Thomas asked why. *Id.* Ray said a group vote had been taken, and the group had decided not to pay political dues. *Id.* Thomas asked Howe if what Ray said was true, but before Howe could respond, Ray said it was true and they did not have money for political dues because they had children to take care of. *Id.* Thomas told Ray that he was talking to Howe, and Ray responded that he was speaking for Howe. *Id.* at 2. Adams then walked toward Ray and asked him who he thought he was. *Id.* Ray stood up, and Adams hit him in the face. *Id.* Ray then reached under his shirt and yelled "nigga I'm gonna blast your ass." *Id.* Someone then yelled, "look out, he got a strap" (slang for a gun), and everyone started running away from Ray, who started shooting wildly throughout the front room. *Id.* Sloan ran into a bedroom. *Id.* He heard a few more shots, and then he saw Thomas run toward the back of the house with a gun in his hand. *Id.* Sloan states that he never saw Ronnie Sloan hit Ray with a bat nor saw Thomas display a gun before Ray began to fire his gun. *Id.* Dave Sloan concludes his affidavit by stating he would have testified thus at trial had he been called by the defendants to do so. *Id.*

Thomas' account of the events that transpired on September 26, 1995, is similar. Thomas

says Howe, Golden and Ray came to his house unannounced as he and Adams were getting ready

to leave. Thomas Aff. at 1. Thomas began talking with his visitors and realized that they had

come over to discuss political dues. *Id.* The Sloan brothers and Coleman also came over

unannounced while Thomas was speaking with Howe, Golden and Ray. *Id.*

> After discussing the political dues with James [Howe] for a few minutes, the
> conversation quickly turned into an altercation when Anthony Adams and Clifford
> Ray exchanged words and Anthony struck Clifford once in the face. Clifford
> reacted to this by reaching underneath his shirt and yelling that he was about to
> "kill this nigga." At this point someone in the room yelled out that Clifford "had
> a strap," meaning Clifford had a gun. Clifford then pulled out a gun and began to
> shoot it indescriminately [sic] throughout my home, in the process shooting both
> James Howe and Karrience Golden. Fearing myself, Anthony Adams or someone
> else was also about to be shot and possibly killed by Clifford, I Andre Thomas,
> returned fire and shot Clifford. At no time prior to Clifford pulling a gun and
> firing did I hold <u>any</u> animosities toward him, nor did I ever intend or conspire with
> anyone to harm him.
>
> I am absolutely positive that at no time did Ronnie Sloan strike or threaten
> to strike Clifford with a baseball bat, and that no-one at anytime wrestled with
> Clifford over possession of his gun. The gun was in Cliffords [sic] complete
> control at the time James and Karrience were shot.

*Id.* at 1-2.

In addition to recounting the events leading to Ray's death, Thomas' affidavit described

his interaction with his attorneys. Thomas says that he told his attorneys his version of events

and expected to testify. Thomas Aff. at 2.

> Both attorneys felt that the case would come down to an issue of credibility, and
> that based on police reports and signed statements by the witnesses, each witness
> had contradicted themselves as well as each other, so neither would be a credible
> witness, therefore the State could not convince the judge of guilt beyond a
> reasonable doubt. After the State presented it's [sic] case in which their
> eyewitnesses were severely impeached numerous times, my attorneys as well as
> my co-defendants [sic] attorneys, Adam Bourgeois Jr., and, Herbert Goldberg,
> were equally convinced that the State had not carried there [sic] burden of proving
> my guilt beyond a reasonable doubt because the judge could not find either of the
> two witnesses [sic] testimony credible based on what he had heard. When I

reminded them that the judge had denied my motion for a directed verdict, Rick [Beuke] stated that he felt that if the Judge was going to find me guilty, he would not have sent me home the weekend of August 8-9th, 1995 [sic]. Several times during this discussion, Chuck [Ingles] told me that I should trust <u>each</u> each [sic] of the lawyers [sic] judgments because they had over one hundred years of trial experience between them and that they had been around "long enough to know which way the wind was blowing after a case."

Based on my attorneys [sic] judgment of the case, as well as the opinion of my co-defendants [sic] attorneys that neither mine or my co-defendants [sic] testimony would be needed in my defense, I Andre Thomas followed this advice and did not testify in my trial.

*Id.* (emphasis in original).

Thomas submitted three additional affidavits describing the pressure his attorneys put on him not to testify. Patricia Lowe attests that after the judge recessed the trial for the weekend, she heard Thomas tell his attorneys that he needed to testify. Lowe Aff. at 1. Lowe says Ingles said the judge did not like the State's witnesses but would like Thomas even less. Beuke said the credibility of the State's witnesses had been destroyed on cross examination, so the judge could not believe them and the State had failed to prove its case beyond a reasonable doubt. *Id.*

Rick [Beuke] told Andre that he knew Andre meant well in wanting to take the stand, but that Andre would cause himself more harm than good if he took the stand when there was no need to. Rick stated that the prosecution would seek to show Andre was a governor in a gang which would hurt him. Andrew again told both attorneys that he felt if he didn't testify he might be convicted. Rick repeated that the state had not proven guilt, and that the only thing they had proved was that the victim was dead, but that they had not proven that Andre had not acted in self-defense. Rick then told Andre that in his opinion, if Judge Karnezis was going to find him guilty he would not have sent him home over the weekend.

On August 12, in the hall outside the courtroom and in my presence Andre again told Chuck [Ingles] he felt his testimony was needed in his defense. Chuck told Andre to trust him and Rick because they as well as the other three attorneys involved in the case knew what they were doing since each of them had over twenty-years experience in practicing law, with most of Rick's being as prosecutor, that between them all was over one hundred years of experience, that either of them could be judges themselves and that in fact one of them representing Adams had been a judge. Chuck then said that each attorney had

been around long enough to know which way the wind was blowing at the end of a trial.

      Rick walked up and Andre again questioned him as to what he should do. Rick told us he didn't see how Judge Karnezis could convict based on the evidence he had heard so far and again advised Andre against testifying. After this last talk with Rick, Andre consented that he would not be called in his defense.

*Id.* at 1-2. Stanley Thomas and Bonia Smith filed substantively similar affidavits.

After reciting the substance of these affidavits, the Illinois appellate court set forth the *Strickland* standard for reviewing an ineffective assistance of counsel claim. *People v. Thomas*, No. 1-00-3519, slip op. at 7 (Ill. App. Nov. 27, 2002). The court pointed out that "[d]ecisions by trial counsel that are considered to be trial strategies or trial tactics ordinarily are not reviewable in the determination of whether counsel was ineffective." *Id.* at 8 (citing *People v. Barrow*, 133 Ill. 2d 226, 248 (1984)). The court first considered Thomas' claim that he was prevented by counsel from testifying on his own behalf. The court said that to obtain an evidentiary hearing on the claim that a defendant was prevented from testifying by his attorney, "he must allege in his affidavit that 'when the time came for him to testify, [he] told his lawyer that he wanted to do so despite advice to the contrary.'" *Id.* (quoting *People v. Brown*, 54 Ill. 2d 21, 24 (1973)). The court found Thomas had not met this standard:

> Here, the record shows that the circuit court admonished defendant that he and the other defendants had "an absolute right to testify in this case" and defendant stated that he understood his right; and that his attorneys had discussed this right with him, but he chose not to testify. In addition, defendant admitted in his affidavit that he accepted his attorneys' opinion and advice and, as a result, chose not to testify. Patricia Lowe's affidavit also stated that defendant consented not to testify in deference to counsel's opinion and advice. Accordingly, defendant failed to demonstrate in his petition, the attached affidavits or the record that trial counsel improperly prevented him from exercising his right to testify.

*Id.* at 8-9.

The appellate court similarly found Thomas had failed to show his counsel acted unreasonably by not calling Dave Sloan as a witness. The court said "[a]n informed decision regarding whether to call a witness to testify at trial or sentencing is a matter of trial strategy which generally cannot support a claim of ineffective assistance of counsel," *id.* (citing *People v. Enis*, 194 Ill. 2d 361, 378 (2000)), and the affidavits made clear counsel were aware of Sloan's potential testimony when they declined to call him as a witness. The court explained this informed decision was not an unreasonable one given "that defense counsel readily could have believed that Sloan's testimony would have been unpredictable, biased and incredible because (1) he was codefendant Ronnie Sloan's brother; (2) his twin brother already had given information to the grand jury against defendant; and (3) the record shows that Sloan sat in the courtroom during trial and attempted to intimidate a witness as the witness testified." *Id.* at 9-10.

We cannot say the appellate court's decision involved an unreasonable application of federal law. We start with Thomas' allegation that his trial attorneys would not let him testify on his own behalf. Considering such a claim, the Seventh Circuit has recognized that "[a] criminal defendant has a constitutional right to testify in his own behalf; it is an aspect of his right to defend himself, a right held in *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987), to be implicit in the Fifth, Sixth, and Fourteenth Amendments." *Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir. 1991) (citations omitted). The decision whether to testify "lies in the hands of the defendant personally." *Taylor v. United States*, 287 F.3d 658, 660 (7th Cir. 2002) (citing *Rock*, 483 U.S. 44, and *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir. 1984)). Thomas has failed to show his attorneys relieved him of this choice. The trial transcript and the affidavits he has submitted belie his claim that he was denied his right to testify. All the affidavits, including Thomas',

make clear that he eventually agreed not to testify. And a colloquy Judge Karnezis conducted

during the trial shows he was offered the chance to testify and declined to do so:

> **The Court:** Mr. Thomas, Mr. Sloan, Mr. Adams, I'm sure all three of you
> understand that at this point you gentlemen have an absolute right to testify in this
> case. You also have an absolute right to exercise your constitutional right to
> remain silent. Do you understand that, Mr. Thomas?
> **A:** Yes.
> **Q:** Mr. Sloan?
> **A:** Yes.
> **Q:** And Mr. Adam?
> **A:** Yes, sir.
> **Q:** Okay. And we assume that you have discussed this with your attorneys,
> respective attorneys and you have – Mr. Thomas, you have chosen to exercise
> your right to remain silent. Is that correct?
> **A:** Yes, sir.
> **Q:** Mr. Sloan?
> **A:** Yes, sir.
> **Q:** And Mr. Adams?
> **A:** Yes, sir.

Trial Tr. (Aug. 12, 1997) at G11-G12. Thus Thomas' claim that his attorneys overbore his will

to testify is unsupported by the evidence, and the Court cannot say the state appellate court was

unreasonable in rejecting his claim.

In his federal habeas petition, Thomas makes the related claim that his counsels' advice

against testifying was unreasonable. Pet.'s Resp. at 22. He did not make this argument explicitly

in his initial brief appealing the denial of his post-conviction petition, emphasizing instead that

his attorneys refused his repeated requests to testify. Resp. Ex. I at 9. However, Respondent

argued before the state appellate court that the evidence showed Thomas agreed not to testify *and*

that Thomas' attorneys were not ineffective in advising him not to testify. Resp. Ex. J at 20, 23-

24. And in Thomas' reply brief, he characterized the issue before the appellate court as whether

the advice given by his counsel was a reasonable trial strategy. Resp. Ex. K at 8. The claim was

clearly before the appellate court, so it was not defaulted. But the appellate court did not address it. Thus there is no state court analysis to subject to AEDPA's "contrary to" and "unreasonable application of" standards. Rather, "we write on a clean slate, unconstrained by any factual or legal findings." *Harding v. Sternes*, 00 C 7515, 2003 WL 21321340, at * 7 (N.D. Ill. June 9, 2003).

Counsel's decision to advise the defendant not to testify is "often motivated by strategic considerations that command deference from the judiciary." *Hampton v. Leibach*, 347 F.3d 219, 257 (7th Cir. 2003) (citations omitted). A court may not "second-guess trial tactics that are rationally-based." *United States v. Zarnes*, 33 F.3d 1454, 1473 (7th Cir. 1994) (citations omitted). Thus, the Seventh Circuit has found an attorney acted reasonably in advising a defendant against testifying because the defendant would be discredited on cross-examination, *Underwood*, 939 F.2d at 475, and because the lawyer believed the government had failed to meet its burden and did not want to abandon the strategy that resulted in a hung jury when the defendant was first tried. *Rogers-Bey v. Lane*, 896 F.2d 279, 283 (7th Cir. 1990). According to the affidavits describing the conversations between Thomas and his attorneys, Beuke and Ingles offered several strategic reasons why Thomas should not testify: the prosecution had failed to prove its case, the Judge would like Thomas even less than the prosecution's witnesses, and the prosecution would highlight Thomas' leadership position in a gang. All three concerns were reasonable under the circumstances.

Although we determined above that there was sufficient evidence to convict Thomas of murder, that does not mean his attorneys were unreasonable in believing the prosecution had failed to prove its case. When reviewing Thomas' claim that the evidence was insufficient to

32

prove him guilty beyond a reasonable doubt, we had to view the evidence "in the light most favorable to the prosecution" and consider whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). Though the Court need not address whether we would have found Thomas guilty of first degree murder in the first instance, after reviewing the trial record we do not believe Beuke and Ingles were unreasonable for believing the State had failed to prove its case. Both Coleman and Golden were convicted felons who had given multiple versions of events, undermining their credibility. Furthermore, neither testified that Thomas had fired the fatal shot. And, perhaps more importantly, the State pursued a complex legal theory that required it to establish several elements.

Thomas' attorneys also had a reasonable basis for advising Thomas that the judge would find him less credible than the prosecution's witnesses. First of all, he had at least as great an incentive to lie as did the prosecution's key witnesses, whose credibility the defense rigorously attacked at trial. Second, Thomas' account of the fatal events, as described in his affidavit, seems at times self-serving and improbable. For example, Thomas states in his affidavit that Ray started shooting indiscriminately throughout his house and no one wrestled with Ray for control of the gun. In contrast, Golden and Coleman testified that Adams wrestled with Ray for control of the gun. Golden and Coleman's account is a more likely explanation for how Golden and Howe – Ray's friends – were the only ones shot with Ray's gun. Given Beuke and Ingles' reasonable belief that the State had failed to meet its burden and Thomas' credibility problems as a witness, we cannot say they acted unreasonably in advising Thomas not to testify.

But we cannot stop there. The Court also must consider Thomas' claim that his

33

attorneys' acted unreasonably by failing to interview and call Dave Sloan to testify, an argument

which the appellate court addressed in its opinion. Thomas points out that he told his attorneys

that Sloan could serve as a potential witness and Sloan had been identified in police reports and

listed by the prosecution as an occurrence witness. Pet.'s Reply at 19. But "[t]he Constitution

does not oblige counsel to present each and every witness that is suggested to him." *United*

*States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990). "A lawyer's decision to call or not to call

a witness is a strategic decision generally not subject to review." *United States v. Williams*, 106

F.3d 1362, 1367 (7th Cir. 1997). Granted, "an attorney who fails even to interview a readily

available witness whose noncumulative testimony may potentially aid the defense should not be

allowed automatically to defend his omission simply by raising the shield of trial strategy and

tactics." *Sullivan v. Fairman*, 819 F.2d 1382, 1389 (7th Cir. 1987) (internal quotation marks and

citation omitted). And "a failure to investigate can certainly constitute ineffective assistance."

*Washington*, 219 F.3d at 631 (7th Cir. 2000) (citation omitted). But "[t]he failure to investigate a

particular lead may be excused if a lawyer has made a 'reasonable decision that makes particular

investigations unnecessary.'" *Id.* (quoting *Strickland*, 466 U.S. at 691).

Although the state appellate court did not directly address Thomas' assertion that Beuke

and Ingles failed to even interview Dave Sloan before rejecting him as a witness, the court's

decision gives justification for Thomas' attorneys to dismiss Sloan as a potential witness without

first interviewing him to learn the intricacies of his potential testimony: he would not be a

credible witness because his brother was also on trial and his twin brother had given damaging

testimony before the grand jury. We cannot say Thomas' attorneys acted unreasonably in

deciding not to interview Sloan or call him to testify, because they had ample reason to believe

his testimony would be more harmful than helpful. *See Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir. 2000) (quoting *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997)) (holding the decision not to call a witness "is sound 'if it is based on the attorney's determination that the testimony the witnesses would give might on balance harm rather than help the defendant'").

Thomas argues his counsels' decision not to call him or Dave Sloan to testify left him "with no defense at all," which the Seventh Circuit found in *United States ex rel. Bernard v. Lane*, 819 F.2d 798, 803 (7th Cir. 1987), to constitute deficient performance. In *Bernard*, even though self defense was the defendant's only defense because he had testified that he loaded his gun thinking he might have trouble with the victim and admitted firing the fatal shot, the defense counsel declined to have the jury instructed on manslaughter or that to convict the defendant of murder the State had to prove the defendant acted without justification. The Seventh Circuit explained,

> Far from being a mere tactical choice, trial counsel's decision to withhold justification and manslaughter instructions, in the face of the jury's clear reluctance to find Barnard guilty of murder was a prejudicial error which forced the jury to convict Barnard. . . . The spectrum of counsel's legitimate tactical choices does not include abandoning a client's only defense in the hope that a jury's sympathy will cause them to misapply or ignore the law they have sworn to follow.

*Id.* at 804-05. In contrast, Beuke and Ingles' primary defense strategy did not hinge on Thomas and Dave Sloan's testimony. Thomas' attorneys attacked the credibility of the State's eyewitnesses and argued the State had not met its burden of proof to show Thomas fired the fatal shots and acted in concert with his co-defendants to harm Ray. Thomas was not left defenseless by his attorneys' conduct.

In hindsight, Beuke and Ingles were overly optimistic in believing the judge would not

find the State had met its burden of proof. But "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland,* 466 U.S. at 689. We must "evaluate the conduct from counsel's perspective at the time." *Id.* The State preceded under a relatively complex legal theory. Given the substantial credibility problems of the State's key witnesses, Thomas' attorneys were not unreasonable in believing the State had not met its burden of proof. Accordingly, the Court cannot properly second-guess the decisions made by the lawyers in reliance on that belief. *See Strickland,* 466 U.S. at 689. The Illinois appellate court did not unreasonably apply federal law in denying Thomas' ineffective assistance of counsel claim.

### Conclusion

For the reasons stated above, the Court denies the petition for a writ of habeas corpus. The Clerk is directed to enter judgment in favor of Respondent.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 2, 2004